THE STATE v. MRS. BESSIE BURNEY, Appellant.—143 S. W. (2d) 273.

Division Two, September 27, 1940.

860

*J. G. Gustin* for appellant.

*Roy McKittrick,* Attorney General, and *W. J. Burke,* Assistant Attorney General, for respondent.

ELLISON, P. J.—The appellant, Mrs. Bessie Burney, was convicted in the circuit court of Greene County of wilfully and maliciously shooting a pistol into the dwelling house of her neighbor, Mrs. Anna Stacey, a felony under Sec. 4031, R. S. 1929, Mo. Stat. Ann., p. 2838. The punishment assessed by the jury was imprisonment in the county jail for six months and a fine of $200. On this appeal she assigns three errors: (1) that the trial court overruled her motion to suppress evidence (namely, her pistol) obtained by the State through an unlawful search of her premises without a search warrant

and before she was arrested: (2) because her application for a continuance was overruled; (3) and that the evidence was insufficient to support the verdict.

On the motion to suppress evidence the appellant testified that on the night of Saturday, August 12, 1939, she was in bed and heard a noise by her front gate, which was locked and about 50 feet from her house. There were two (automobiles) carloads of people out there and they wanted in. She went out and let them in. They said they were officers and after all had proceeded half way to the house they inquired "Have you got a gun?" She answered "Yes" and they said "Can we see it?" She replied "Certainly." The party went into the house and she produced a .25 calibre automatic revolver from under the pillow on her bed and handed it to one of the deputy sheriffs, who put it in his pocket. He said, "Well, we will have to take you down." Then they arrested her without a warrant and against her will. The pistol was taken before the arrest, and appellant asserted the officers did not inform her of any charge against her.

But on redirect examination she was asked if "prior to this time (which we understand to mean the occasion of her arrest) she had heard anything about anybody shooting into the Stacey house, or any house," and she answered she "never heard about it any except from the officers." She further declared she didn't understand the pistol would be used as evidence against her, but on recross-examination in answer to a question whether she "parted" with it voluntarily, she replied, "I handed it to them voluntarily, and they put it in their pocket; I gave it to them willingly because I respect the law, I was raised to respect the law."

From the testimony of the deputy sheriff who made the arrest it may be inferred he was a little more peremptory in seeking entrance to the premises than would appear from appellant's own testimony. But there is nothing in his narrative to indicate he made a *demand* to see her pistol, though he did answer affirmatively on cross-examination a question in which that word was used. He further said he asked her "if she had been shooting around there and she said no." This witness also declared that appellant was fully dressed when she came out to the gate. (She had testified she was in bed when the officers called.) The sheriff arrived at appellant's home after the other officers but before the arrest. He said she informed him she had already turned her pistol over to the deputy sheriff, and (either that night or the next day at the jail) she told him he could keep it.

▪ Appellant contends the search for and seizure of her pistol were illegal because done without a search warrant and prior to her arrest, not as an incident thereto. For the purposes of the case we may concede this to be true unless she voluntarily consented. On the latter point appellant cites State v. Owens, 302 Mo. 348, 358, 368, 259 S. W. 100, 102(3), 105(6), 32 A. L. R. 383, a decision by

this court en banc, which holds: "If an officer appears at a person's home, and in his official character demands the privilege of seaching the premises, the owner of the premises who yields peaceably and silently to the official demand is as much under constraint as if he had forcibly resisted official interference. . . . If the officer enters the dwelling of one not charged with a crime, and by stealth or forcibly without a warrant or any legal authority obtains papers of an incriminatory nature, it is almost universally held that such papers may not be produced in evidence."

But in that case a sheriff walked up to a man on the street and forcibly searched him, taking a bottle of whiskey from his pocket. The sheriff testified the man "never hollered nor made no big noise." Contrast that with the instant case where appellant herself testified that when the deputy sheriff asked her if they could see her pistol, she replied "Certainly," led them into the house and produced it from under her pillow. Later she declared "I handed it (the pistol) to them voluntarily, and they put it in their pocket; I gave it to them willingly because I respect the law . . ." In addition to that the sheriff testified appellant told him she had already turned her pistol over to the deputy sheriff, and either the night of her arrest or the next day consented that he keep it.

As regards the question whether the officers obtained the pistol by stealth or trickery, the appellant admitted the officers told her they were officers before she led them into the house; and under redirect examination by her own counsel she said she had never heard anything about anybody shooting into the Stacey house or any house, "except from the officers." The deputy sheriff declared he asked her "if she had been shooting around there and she said no." He also asked to see her pistol. This was enough to indicate to appellant that she was under investigation for some shooting into the Stacey house, though there was no direct accusation of it. We think there was substantial evidence that she voluntarily produced the pistol and consented to its retention by the sheriff's office. In that state of the record it was the duty of the trial court to pass on the questions of fact raised by appellant's motion to suppress and the testimony introduced thereunder. We see no ground for overturning the ruling made—in other words we cannot say the ruling was not supported by substantial evidence, or, for that matter, by the weight of the evidence.

Touching the overruling of appellant's application for a continuance. She was arrested and her pistol seized as evidence on August 12, 1939. There was a preliminary hearing at which was produced the bullet allegedly fired by appellant into Mrs. Stacey's house. Appellant had an expert examine the premises on August 25. The information was filed on September 14. On October 5 her motion to suppress evidence was filed, and was overruled two days later on

October 7. One day before the trial, October 10, she filed her application for a continuance, the ground therefore being that she wanted a ballistics expert to make tests with her pistol for the purpose of ascertaining whether the same would leave characteristic marks on a bullet fired therefrom. It was alleged this evidence was desired to refute reputed tests made by an expert for the State without notice to appellant, of which *she* had learned only four or five days theretofore.

But in her brief appellant says: "The defendant here could not reasonably anticipate that the court would overrule her motion to suppress evidence. . . ." This statement impliedly recognizes appellant should have anticipated ballistics evidence would be important *if* her pistol were admitted in evidence. It was a matter for appellant's counsel, not herself, to appraise her legal situation. The motion to suppress the evidence was not filed until three weeks after the information was lodged. When the motion was overruled on October 7 appellant did not forthwith announce her desire to obtain ballistics testimony, but waited until three days thereafter and one day before the trial to file her motion for a continuance. We are not warranted in ruling as a matter of law that appellant showed due diligence and that the trial court abused its discretion in denying the continuance. This assignment is without merit.

Considering now appellant's assignment on the merits that the evidence was insufficient to support the verdict. The evidence is wholly circumstantial, and appellant invokes the well established rule that in such cases the circumstances proven must be consistent with each other and with the guilt of the accused, and inconsistent with any reasonable hypothesis of innocence. Proof is lacking, says appellant, in two essential particulars: (1) to establish the *corpus delicti*—that a crime had been committed; (2) that appellant was present at the scene of the crime. These contentions necessitate a review of the evidence.

The homes of the appellant and Mrs. Stacey were about 150 feet apart with a fence and row of shrubbery between the two properties 50 or 60 feet from the Stacey house. Several windows in the latter faced appellant's house, one being in the kitchen. The bottom of this window was about 4½ feet above the ground and the top about 8 feet. Shrubbery planted thereunder may have partially obscured a view of the lower half, but not the upper, from appellant's home. There were upper and lower window panes, each set in a pine wood sash with adjacent horizontal cross-members overlapping and extending across the middle of the window. Outside these was a wire screen with a wooden frame having a horizontal cross-member at the same level and a wooden moulding outside the screen, thereby making over three inches of wood.

One night in March, 1939 (the witnesses could not fix the date more

definitely) between 9 and 10 o'clock Mrs. Stacey and her maid, Emma Stroud, heard a pistol shot and a noise like the shattering of a window. Mrs. Stacey testified she had just stepped out of the kitchen and turned out the light, and was in her bedroom. They had been washing the supper dishes, and the maid testified she had just finished them. She, also, had gone to her bedroom and was starting to write a letter. Mrs. Stacey said both returned to the kitchen to see if the window was broken but discovered nothing. The maid did not remember about that, but she said Mrs. Stacey called the sheriff and nobody came. Mrs. Stacey did not testify about that. Otherwise their testimony agreed. The next morning the maid in sweeping the kitchen found a bullet on the floor about two feet from the window and toward the corner of the room. Inspection revealed a bullet hole passing through the cross-member of the screen and window sash just under the glass and curved upward emerging through the top of the middle or inside sash. The location and course of the hole indicated the bullet had come from the direction of appellant's house. Mrs. Stacey thereupon called her relatives and they took the bullet to the prosecuting attorney. She suspected the appellant.

The reason for this was that appellant had threatened to kill her several times. Five or six months before, appellant had falsely accused her of killing chickens belonging to appellant's then boarder, a Mr. E. L. Mitchell. At different prior times appellant had thrown tin cans and rocks in the Stacey yard. Once she hurled a rock which just missed one of Mrs. Stacey's guests at a party. The two families had never visited during the eleven years since appellant had lived there. Mr. Mitchell, the former boarder, swore he had heard appellant repeatedly threaten to harm Mrs. Stacey, not only to hurt but to kill her. She said these things to the witness, Mitchell; also to his wife, and once, using the vilest language, to Mrs. Stacey, herself, when the latter was out in the yard. On that occasion she attempted to climb over the fence, but had no firearm. Mrs. Mitchell testified she had heard appellant threaten to kill Mrs. Stacey time after time, and go in and get her gun and run over to the fence. Mrs. Stacey would come out of her own house when appellant would do that. The witness had seen appellant frequently holding a pistol similar to the one offered in evidence. The undisputed testimony disclosed that Mr. and Mrs. Mitchell had moved away from appellant's home about two months before the shooting occurred; that their relations were strained; and that appellant had sued Mr. Mitchell for $10 rent and recovered judgment. He was a private detective and held a deputy sheriff's commission.

Getting back to the finding of the bullet in March. Mrs. Stacey and her relatives took it to Mr. Davidson, assistant prosecuting attorney. Shortly afterward he gave it back to her and she carried it in her purse in the envelope in which it was enclosed when he returned

it to her. Nothing was done about prosecuting appellant at that time. But one night the following August some BB shot were fired against the window of Mrs. Stacey's house and she summoned the sheriff's office. One deputy sheriff testified three calls were received. This was the occasion when appellant was arrested and her pistol seized, as already narrated.

The facts heretofore detailed as to what occurred at that time were presented to the court in the absence of the jury, as we understand, in connection with the hearing on appellant's motion to suppress evidence. When the evidence on the merits was introduced before the jury the facts shown were not essentially different, from the State's standpoint, except the sheriff testified that appellant admitted she had been shooting on some occasion for practice or self instruction. He also said that when they made the arrest appellant was intercepted as she ran toward the head of the bed, and bit his hand.

The appellant testified she had owned the pistol for twenty years, and customarily kept it under her pillow. She denied firing the weapon toward the Stacey house at any time but admitted shooting it in the air three or four times in July when she heard a noise out toward the mail box. She also denied having threatened to kill Mrs. Stacey or do her great bodily harm, but conceded she might have threatened to give her a licking or try it. She declared the pistol was fully loaded when the officers took it. In answer to leading questions she said she kept the pistol because she was afraid of a "wild dog scare" and lived alone by the railroad track. She also said boys from town would come outside the city limits by her house and shoot guns at targets. On cross-examination she admitted she didn't know of their doing that at 9 or 10 o'clock at night.

On the night of August 12 Mrs. Stacey gave the bullet heretofore mentioned, found by the maid and which she had been carrying in an envelope in her purse, to deputy sheriff Galbraith. The evidence does not directly trace the bullet from then on but it was introduced in evidence and identified by the prosecuting witness, Mrs. Stacey, assistant prosecuting attorney Davidson and in a less positive way by the maid, Miss Stroud, all mentioning a dent in it as an individualizing characteristic, though Miss Stroud would only say the exhibit "looked a lot like" the bullet she found. She wouldn't "say for sure" they were one and the same. The testimony of these three witnesses was sufficient to make the bullet competent evidence, notwithstanding the testimony did not directly trace it from hand to hand during the intervening months. [State v. Shawley, 334 Mo. 352, 372(7), 67 S. W. (2d) 74, 84(18).] We may mention here that appellant disputed the authenticity of the bullet offered in evidence, her counsel claiming he had publicly commented at the preliminary hearing on the fact that the bullet there presented as the one found by Miss Stroud was free from blemish. Mrs. Stacey conceded the at-

torney did make that statement at the preliminary, but denied the bullet then exhibited was smooth. The appellant corroborated the attorney on both these alleged facts. Appellant's ownership of the pistol offered in evidence was not disputed.

The bullet and pistol were submitted to Sergeant Koch of the State Highway Patrol, a ballistics expert. He fired test bullets through the pistol and examined the test bullets and the evidence bullet under a comparison microscope, photographs being taken of the images of the two in juxtaposition, enlarged between 150 and 175 times. Appellant did not bring up these photographs with the record, but the Sergeant's testimony discloses that markings on the compared bullets were similar and indicated they had been discharged from the same firearm. The witness expressed the expert opinion that such was the fact.

Appellant's counsel strenuously attacks this testimony in his brief, seizing on a statement of the witness during cross-examination that he based his conclusion on the "law of probability." The brief contends there can be no conviction of crime on mere probabilities. But this contention is not fair to the witness, who explained the principle is based on the fact that no two things are alike, as illustrated by finger prints. He declared no man has examined enough finger prints to say he never will find two alike, meaning, as we understand, it is within the remote realm of possibility that identical finger prints may some day be discovered, but such have not yet been encountered by any one man. In other words, practically it is impossible for a pistol to make dissimilar markings in the aggregate on bullets fired from it. This character of evidence has been several times recognized by this court as having high probative value. We need not go into the question further. [State v. Shawley, supra, 334 Mo. l. c. 377, 64 S. W. (2d) l. c. 86 (26); State v. Markel, 336 Mo. 129, 133, 77 S. W. (2d) 112, 114; State v. McKeever, 339 Mo. 1066, 1080 (9), 101 S. W. (2d) 22, 29; State v. Couch, 341 Mo. 1239, 1243 (3), 111 S. W. (2d) 147, 149; State v. Richetti, 342 Mo. 1015, 1031 (4), 119 S. W. (2d) 330, 337.]

The witness also testified the effective range of the pistol would be 200 or 300 yards, depending on the powder charge. He said a bullet therefrom would penetrate two to four inches of pine board at a distance of approximately 25 or 50 feet. It would maintain its initial velocity for about a second. Appellant introduced as an expert a carpenter and mechanic who had served in the U. S. Army 18 years. He thought the range of the pistol would be 250 to 300 yards. He had examined the Stacey window frame on August 25, and experimentally fired shots from a similar pistol against three one-inch pine boards placed against a rock. The bullets went clear through. He described the wood in the Stacey window frame as decayed, rotten or weathered, and expressed the opinion that the

hole therein had been made by a spent bullet after traveling 250 or 300 yards. It could not have been made by a pistol fired within 150 yards (the distance between the two houses) because, he said, the bullet would have passed clear through the room into the opposite wall. From this he concluded it had come from some point further away than appellant's house. Mrs. Stacey denied that the wooden window frame was decayed. It was over 15 years old, but had been painted about every spring and was strong and held its shape.

Appellant's expert had measured the hole in the window frame and found the diameter to be about 1/16 inch less than that of a .25 calibre pistol. But the boards into which he had fired test shots were produced before the jury, and the holes in them were smaller than the hole in the window frame; and he could not insert a .25 calibre bullet in them. He said that was because "the grain of the wood closes them up." On cross-examination he admitted the hole in the window frame "might" have been made by a .25 calibre bullet; that there wouldn't be "a thing out of the way in that." Deputy Sheriff Galbraith said the hole in the window frame appeared to him to have been made by a .32 calibre bullet. Mrs. Stacey, Miss Stroud and Sheriff Pierpoint thought the bullet and the bullet hole were about the same size. The appellant denied the bullet found in Mrs. Stacey's house had come from her pistol—didn't see how it could have.

We have set out the evidence rather fully to show wherein the State's evidence was disputed. Recurring to appellant's contentions that the *corpus delicti* was not proven, and that there was no evidence showing she was at the scene of the crime. In considering these questions it should be remembered appellant did not offer a demurrer to the evidence either at the close of the State's case or of the whole case, but put an expert on the stand, and testified, herself. Her contentions now are to be measured by all the evidence. [State v. King, 331 Mo. 268, 278(6), 53 S. W. (2d) 252, 257.] Also, since she voluntarily became a witness, appellant's failure to explain incriminating circumstances may be considered. [State v. Larkin, 250 Mo. 218, 234(III), 157 S. W. 600, 604, 46 L. R. A. (N. S.) 13; State v. Blackmore, 327 Mo. 708, 717, 38 S. W. (2d) 32, 35.]

Appellant's contention that the *corpus delicti* was not proven, meaning there was no substantial evidence that *anybody* fired the bullet into Mrs. Stacey's window wilfully and maliciously, is bottomed on the argument that someone innocently may have shot a stray bullet that night which struck an object and glanced through the window frame, this theory being supported by the testimony that the evidence bullet had a "dent," or "mark" as some witnesses said, on it. The contention that appellant was not shown to have been at the *locus criminis* is grounded on the facts that no witness saw her fire the shot, or even saw a flash from the pistol which would have

disclosed the location of the person discharging it. But these arguments ignore the ballistics testimony, which was strong evidence that the bullet was fired from appellant's pistol. The hole in the window frame indicated it came from the direction of her home or yard. Her own testimony was that she had been in possession of the weapon all the time and kept it under her pillow. She said it hadn't been fired for two years except when she shot it in July after she heard the noise at her mail box. If she didn't fire the shot through Mrs. Stacey's window, who did? Appellant had no explanation on the theory that she shot by mistake, or that someone else had obtained possession of the pistol. She had threatened to kill Mrs. Stacey several times and admitted she may have threatened to give her a licking. She was a woman ready to commit violent acts.

Her defense largely is an attack on the State's evidence. Her counsel asserts in his brief that the bullet submitted by the prosecutor's office to Sergeant Koch of the State Highway Patrol for ballistic tests was not the one found in the Stacey house and exhibited at the preliminary but another which would pass such tests. The statement in the brief is: "Only the rankest unsophistication would suppose he (Koch) was furnished an object over which any doubt could arise." Grave charges such as this should not be made lightly. Counsel may sometimes be excused for statements uttered in the hurry and heat of oral argument, when the same statements made cooly and deliberately in a formal brief to this court should be scrutinized with less indulgence. Either the prosecutor's office committed a grevious wrong, or appellant's counsel has transgressed the bounds of legitimate argument in charging that office *framed* the case by substituting a bullet which would pass ballistic tests. The jury found against that argument. We think the evidence made a case for the jury.

Finding no error, the judgment is affirmed. All concur.