**STATE of Missouri, Respondent,**

v.

**Arlester E. SCOTT, Appellant.**

**No. WD 33594.**

Missouri Court of Appeals,
Western District.

Feb. 15, 1983.

Allen R. Purvis, Elwood L. Thomas, Anne E. Goos, Kansas City, for appellant.

Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, C.J., and CLARK and KENNEDY, JJ.

CLARK, Judge.

Arlester E. Scott, charged with robbery first degree, was convicted by a jury and was sentenced by the court to a term of twenty-five years. On this appeal, Scott presents eleven points of trial error. We conclude that the conviction must be reversed by reason of prejudice to the defendant when the state was permitted to call two witnesses not disclosed to the defense in pre-trial discovery. Other points of error will be discussed by reason of their impact upon future disposition of the case.

A detailed survey of the evidence presented to the jury is required to compose the setting in which the testimony by the unendorsed witnesses was proposed. In the main, the facts of the crime were uncontroverted, the sole issue being whether the accused, Scott, was one of two men who committed the robbery.

The state's evidence initially established that in the early afternoon of March 27, 1981, a robbery was committed at a Milgram's food market in a Kansas City shopping center. The robbers were two black

men, one short and the other tall with a full dark beard. Both men wore gloves but were otherwise undisguised. The shorter man confronted the store manager at his office and he was soon joined there by the taller man who brought two other employees from a nearby lounge area. Both men were armed with handguns which were used to enforce their demands. The three employees were then directed into the office and, upon threatened use of the weapons, the manager opened a safe from which the shorter man took cash and money orders. While the robbery was in progress, a fourth store employee came to the office and he was compelled to join the others held at gunpoint by the taller robber.

After the money and checks had been obtained, the hands of all the store employees were bound with duct tape, a material used to seal heating pipes and equipment. The robbers then left locking the office door. The store manager was the first to free himself and he returned to the public area of the store in time to see the robbers as they left through the front door. He followed, observed the car in which the robbers fled and gave chase in his own car but lost pursuit in traffic.

The hypothesis of the prosecution was that Scott was the taller of the two robbers. None of the four store employees, however, made any positive identification of Scott. The store manager testified he thought Scott was the man but he was uncertain because the tall robber was bearded while, at trial, Scott was clean shaven. The three other employees expressed no opinion on identification of the robbers at all. Scott's implication in the crime rested entirely on a fingerprint comparison. That print was allegedly recovered by an evidence technician, William Fortner, from a scrap of cardboard retrieved from the floor of the Milgram store manager's office. It is the source and integrity of the piece of cardboard and the expert opinion that Scott's fingerprint was on that cardboard about which the testimony in question centers.

The state called as a witness Daniel Burns, a district police officer who was first to respond to the robbery call. The defense objected to use of Burns as a witness because he had not been endorsed as a prosecution witness and his name had not been supplied in response to discovery requests by the defense. The court denied a motion to disqualify Burns as a witness but did declare a recess to permit defense counsel to interview Burns before he testified. Following the interview Burns took the stand and testified that when he arrived at the store, he confirmed the occurrence of the crime, called the police dispatcher for a laboratory crew, protected the crime scene and took information from witnesses. Burns described the arrival of police laboratory technician, Fortner, who Burns saw, "out of the corner of his eye," going about his work gathering evidence. According to Burns, a box or wrapper which had contained duct tape was on the office floor and this was among the materials Fortner placed in an evidence bag. After Burns had given his evidence, it was disclosed that Fortner, the evidence technician, could not be located. The foundation for admission of the scrap of cardboard from which the fingerprint had allegedly been recovered therefore depended on the testimony of Burns and of the store manager in his description of how duct tape had been used to bind the store employees' hands. The defense objected to admission of the exhibit on the grounds that insufficient proof had been offered to identify the exhibit or to show its condition from the time of retrieval to the time of examination. Ruling on admission of the exhibit was deferred.

The state then called Steven Worlan, an officer assigned to the Regional Crime Laboratory as a fingerprint expert. The defense objected to the state's use of Officer Worlan because, in like manner as had been the case with Daniel Burns, the prosecution had made no disclosure in pre-trial discovery of its intention to call Worlan as a witness. Again refusing to bar the state from use of a surprise witness, the court provided the defense an opportunity to interview Worlan before he testified. The defense protested that the interview was an insufficient remedy to allow preparation for

cross-examination of an expert witness, but the court refused the defense motion to disqualify the witness. The court also overruled a defense motion challenging Worlan's testimony on the ground that the exhibit from which Worlan had allegedly recovered the fingerprint had not been admitted in evidence.

Called to the stand, Worlan then testified that on April 16, 1981, he checked out from the laboratory property room an evidence bag which was sealed and which bore initials he knew to be those of William Fortner. In the evidence bag he found surgical gloves, pieces of duct tape and cardboard from a box indicated to have contained duct tape. Examination of the articles for fingerprints disclosed recoverable prints only from the cardboard. Worlan developed two prints from the cardboard, photographed them and returned the articles and the evidence bag to the property room.

Also offered and received in evidence was an inventory report from the police files which recorded various transfers of the evidence bag containing the gloves, the duct tape and the cardboard from the box. According to the report, the bag was delivered to the Regional Crime Laboratory March 30, it was returned to the Kansas City, Missouri police property room April 1 and was redelivered to the laboratory April 15. The transfers back and forth from the crime laboratory were otherwise unexplained as related to the examination performed by Worlan April 16.

The state next called Richard Schweiterman, a latent print examiner with the police department. The purpose of Schweiterman's evidence was to connect Scott to the crime scene through fingerprints. The defense objected to Schweiterman's testimony on the ground that neither the cardboard nor the photographs of prints had been admitted in evidence. The objection was overruled and Schweiterman testified that a known print of Scott corresponded with one of the photographed prints taken from the cardboard.

By the third day of trial, Officer Fortner still had not been located. At this point, the court ruled to admit in evidence the state's exhibits including the cardboard box and the fingerprint photographs. The court stated the exhibits were being received because the court was "relatively convinced that the box in question is the box that was on the floor there that day."

## I.

On this appeal, Scott presents three points associated with admission in evidence of the duct tape box and the evidence dependent on the box for foundation. He first asserts that the tape box was erroneously admitted without proof of a proper chain of custody necessary to establish that the exhibit was in fact the same tape box collected at the scene of the crime and, if so, whether the box was in the same condition when examined for prints as when taken from the Milgram store. In the second and third points, Scott contends the court erred in failing to exclude the testimony of witnesses Burns and Worlan because their names were not supplied in response to several pre-trial discovery requests propounded to the state by the defense.

In the absence of testimony from Fortner, the officer who collected the evidence at the Milgram store and presumably delivered it either to the police properly room or to the laboratory, the foundation for admission of the exhibit on which the print comparison depended consisted of the testimony by the store manager as to what the robbers had used to bind the victims, the testimony of patrolman Burns as to what he observed Fortner doing and the testimony of Worlan who opened the evidence bag some two weeks later and examined the contents. The questions presented are whether the state was entitled to use Burns and Worlan as witnesses after failing to disclose them in pre-trial discovery and, whether the proof from these witnesses was sufficient to establish the integrity of the physical evidence.

With respect to Scott's complaint about both surprise witnesses, the record of defense discovery efforts is relevant. When

the information was filed in the case, Worlan's name was endorsed as a witness, but Burns' was not. On June 11, 1981, the state sent a letter to defense counsel listing the witnesses who would be called by the prosecution. That letter listed neither Burns nor Worlan. On June 29, 1981, the defense filed its request for discovery including the request for disclosure of persons to be called as witnesses. The state made no formal response, but in answer to letters from defense counsel dated July 10, August 28, and October 13, 1981 seeking the information about prosecuting witnesses, the state responded that the information had already been supplied. At a side bar conference when defense counsel pointed out that disclosure of witnesses Burns and Worlan had only occurred as trial began, the state candidly acknowledged that defense counsel had been unintentionally misled as to the witnesses who would be called.

In this case, the crucial nature of the evidence to be supplied by witnesses Burns and Worlan is self-evident. Without both witnesses, the state plainly had no case. Defense counsel pointed out to the court that preparation of the defense had been based on the list of witnesses furnished in the prosecutor's letter and most, if not all, of those witnesses had been deposed. The trial court conceded the merit of defendant's objection to use of state's witnesses Burns and Worlan without prior disclosure and the state agreed that the context of pre-trial discovery had misled the defense as to prosecution witnesses. As a solution to the problem, the trial judge offered defense counsel a choice between a mistrial declared sua sponte by the court or an opportunity to interview Burns and Worlan before they testified.

In a side bar conference discussing the issue, defense counsel informed the court Scott did not seek a mistrial and had no practical option to accept that sanction. Scott was, at the time, on probation from a federal sentence. His arrest on the current charge was alone sufficient to trigger revocation unless he could secure an acquittal. His only prospect of avoiding revocation was to pursue the trial then in progress in

the hope of a favorable verdict. As the record discloses, however, the trial court gave no consideration to granting Scott's motion to bar the state from using witnesses Burns and Worlan but viewed a mistrial or the opportunity to interview the witnesses as the full range of available sanctions. Scott and his attorney, faced with this Hobson's choice, refused the proffered mistrial and made the best of the interview opportunity, conducted while the court and jury stood by awaiting resumption of proceedings.

■ Rights of discovery provided criminal defendants by Rule 25 have constitutional underpinning rooted in due process. *State v. Wilkinson,* 606 S.W.2d 632, 636 (Mo. banc 1980). The basic object of the discovery process in criminal proceedings is to permit defendant a decent opportunity to prepare in advance of trial and avoid surprise, thus extending to him fundamental fairness which the adversary system aims to provide. *State v. Sykes,* 628 S.W.2d 653, 656 (Mo.1982). The rules of criminal discovery are not mere etiquette nor is compliance to be at discretion. The obligation to make answer is peremptory. *State v. Stapleton,* 539 S.W.2d 655, 659 (Mo.App.1976). Where the state has failed to respond promptly and fully to the defendant's disclosure request, the question is whether the failure has resulted in fundamental unfairness or prejudice to the defendant. *State v. Dentman,* 635 S.W.2d 28, 32 (Mo.App.1982). If the trial court believes fundamental unfairness may result, one sanction to be employed is exclusion of the matter not disclosed. *State v. Johnson,* 524 S.W.2d 97, 101 (Mo. banc 1975).

■ The fundamental unfairness of permitting the state to call previously undisclosed witnesses to prove vital elements of the prosecution's case can scarcely be debated. On this point, it appears that at the time, neither the court nor the prosecuting attorney entertained any doubt that some remedy was required to overcome the prejudice which summoning Burns and Worlan at the eleventh hour had produced. Scott

did not seek and his cause was not furthered by a mistrial which, of course, would have aided the state in providing added time to locate the evidence witness, Fortner. The issue, then, is narrowed to determining whether the opportunity given defense counsel to interview the witnesses eradicated the prejudice. We conclude it did not.

To provide meaningful discovery, not only must the defendant be informed as to the identity of prospective witnesses, he must have a decent opportunity to prepare to meet the testimony. Here, an interview with these witnesses during a trial recess fell far short of meeting the standards of due process which the cited cases require. As to Worlan, the fingerprint expert, defense counsel validly protested he was unprepared to confront such a witness, he had developed no format for cross-examination and he had no opportunity to consult with another expert in the field. As to Burns, the interview was ineffective for other reasons. At the time, the state had made no disclosure that Fortner could not be found and that Burns would provide the sole link in the first chain of custody to the critical fingerprint exhibit. Instead, Burns was portrayed as a routine witness describing the scene of the crime.

Under the circumstances of this case, the trial court erred in failing to sustain defendant's motion to exclude witnesses Burns and Worlan for failure of the state to provide timely discovery. In no other way could the prejudice to Scott's due process rights be effectively removed. On this ground, Scott's conviction must be reversed.

■ The initial claim by Scott that the duct tape box and fingerprint photograph should have been excluded from evidence for lack of evidentiary foundation is mooted if witnesses Burns and Worlan be disqualified. Assuming, however, any doubt on that account, the conviction must nonetheless be reversed because this alternate contention is valid.

The testimony of Burns, as noted above, established only that some evidence similar in appearance to the piece of cardboard from which the fingerprint had been obtained was gathered by officer Fortner along with other objects and placed in an evidence bag. Burns could not and did not attempt to state that the exhibit offered in evidence was one of the items Fortner had retrieved. No witness who thereafter testified had any contact with the exhibit during the following two weeks until, on April 16, Worlan opened the evidence bag and examined the contents. There was no testimony as to what Fortner did with the evidence after he left the Milgram store, no testimony as to where the evidence was stored or in what condition or upon what safeguards. The only evidence as to this subject was the evidence inventory report and narrative account authored by Fortner and admitted as a business record. Significantly, the report and Fortner's narrative described in detail the evidence recovered at the crime scene, including the gloves and pieces of duct tape used to bind the victims but neither document made any mention whatever of a duct tape box or a piece of cardboard. While Worlan did identify Fortner's initials on the evidence bag, he had no knowledge as to the source of the contents and he was unable to explain why the evidence bag was twice delivered to the crime laboratory.

■ Rules describing requisite proof for chain of custody have been variously stated in prior decisions. In order to admit testimony showing the results of tests performed on articles, it is necessary to satisfy the court, not only as to the identity of the articles, but that they were in the same condition when tested as when recovered. *State v. Myers*, 351 Mo. 332, 172 S.W.2d 946, 949 (1943). The prevailing law in this state is that the evidence must provide "reasonable assurance" that the exhibit sought to be introduced is the same and in like condition as when received. *State v. Collins*, 601 S.W.2d 640 (Mo.App.1980). While the state need not account for hand to hand custody of evidence, it must provide reasonable assurance the evidence presented has been neither altered nor substituted. *State v. Pernell*, 606 S.W.2d 389, 392 (Mo.App.1979).

The absence of testimony by Fortner left a material gap in the proof necessary to show with reasonable assurance the exhibit was in fact an article collected at the crime scene. That assurance was of particular importance here where Scott was not shown by other evidence to have had any connection with the exhibit and upon that exhibit alone depended the entitlement of the state to take the case to the jury. Moreover, the necessity for Fortner's testimony is underscored by the glaring omission in his official report of any mention of the exhibit. Finally, there was no proof at all that the exhibit was preserved intact from March 30, the date of the crime, until April 16 when Worlan made his examination. On the proof offered, admission of the exhibit should have been denied.

## II.

In the event Scott be retried,[1] other points of error presented on this appeal would be relevant and require discussion on that account.

Two of the points concern the state's verdict directing instruction and contend it to have been erroneous because conjunctive conduct between Scott and the other participant in the theft was not hypothesized. Also contended as a defect in the instruction are the uses of various terms to identify the other participant creating confusion as to what acts by Scott were prerequisite to conviction. Instruction No. 11, the state's verdict directing instruction, appears in the record as follows:

"First, that on March 27, 1981, at approximately 1:15 p.m. in the County of Jackson, State of Missouri, the defendant or another stole money orders in the charge of Don Gruis, and

Second, that the defendant and another in doing so threatened the immediate use of physical force on or against Don Gruis for the purpose of forcing Don Gruis to deliver up the property, and

Third, that in the course of stealing the property, the defendant or a participant with the defendant in the crime displayed or threatened the use of what appeared to be a deadly weapon or dangerous instrument,

then you are instructed that the offense of robbery in the first degree was committed, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that in the commission of such offense the defendant acted with such other person with the purpose of committing that offense,

then you will find the defendant guilty of robbery in the first degree."

Although marginal notation on this instruction indicates it to have been patterned after "MAI–CR 23.02 and Mod 2.05", such notation was apparently an error. The instruction actually bears closest resemblence to MAI–CR2d 2.12 using portions of MAI–CR2d 23.02. In part, the difficulty with the instruction may be attributed to an effort by the court to use a modified form of MAI–CR2d 2.12 which was not yet in effect at the time this case was tried and which was soon withdrawn. Some review of changes in MAI–CR2d 2.12 during this time period will verify the assumption and identify the problem with the instruction used.

Prior to January 1, 1982, the applicable verdict directing instruction where the accused was charged as an active participant or aider with others in the commission of the offense was MAI–CR2d 2.12 as promulgated effective January 1, 1979. On April 14, 1981, however, the Missouri Supreme Court ordered the former MAI–CR2d 2.12 and its Notes on Use repealed and a new MAI–CR2d 2.12 and Notes on Use adopted for use in cases tried after January 1, 1982. This revision was short lived. On February 16, 1982, the court issued an order reinstating the former MAI–CR2d 2.12. The form of MAI–CR2d 2.12 provided in the order of April 14, 1981 was expressly limited by the February 16, 1982 order to use for cases

---

1. The parties have not raised or briefed double jeopardy implications of retrial and a second attempt to establish as competent the finger-print exhibits. No opinion is expressed here on the subject.

tried between January 1, 1982 and April 1, 1982. 38 Journal Missouri Bar 211–212 (1982).[2]

The present case was tried in October, 1981. The appropriate instruction form was MAI–CR2d 2.12 effective January 1, 1979. Instruction No. 11 as given, however, was an adaptation of the MAI–CR2d 2.12 form contained in the Supreme Court order of April 14, 1981 using a combination of subparagraph 3 or subparagraph 5. By using that form rather than the January 1, 1979 form the court erred in several respects, among which was the substitution of the word "or" for the word "and" in the first paragraph. The instruction thus failed to ascribe the necessary elements of the crime to Scott.

The elements of robbery first degree, § 569.020, RSMo 1978, are (1) stealing property (2) forcibly (3) by means of a deadly weapon or dangerous instrument. The first portion of Instruction No. 11 given in this case authorizes conviction of Scott if the jury finds "the defendant *or* another stole money orders." (Emphasis added). While it would, of course, have been proper to convict Scott of the robbery even though he did not physically appropriate the money orders at the Milgram store, to do so the jury would be obliged to find that Scott provided aid to the co-participant who actually committed the theft. The MAI–CR2d 2.12 in effect when this case was tried includes this language, but Instruction No. 11 as given does not. The instruction given was erroneous because it authorized conviction of Scott for robbery even though Scott committed no theft and did not provide aid to the participant who did.

■ It must be acknowledged that the April 14, 1981 version of MAI–CR2d 2.12 in the fifth subparagraph variant suggests first paragraph instruction use alternately of the words "or" and "and", much as was done in this case. This feature was unique to that version of MAI–CR2d 2.12 and has neither appeared before nor since in the approved forms of the instruction. Whether such explains the abrupt recall of the

form is not recorded. As used here, however, the disjunctive "or" postulating Scott's conviction if some other person stole the money orders was confusing and prejudicial. Any instruction hereafter given in this case should hypothesize the joint conduct of Scott and the co-participant in commission of the theft.

■ Instruction No. 11 also erred in subsequent paragraphs by intermingling use of various terms to describe Scott's co-participant. In the several forms of MAI–CR2d 2.12, others acting with the accused are to be initially referred to by name or "a certain person." In the April 14, 1981 version, the word "another" was also suggested. In subsequent paragraphs of the instruction, the co-participant is referred to in the same manner, that is, by name or as "such other person." The sense of the language is to refer back to the first paragraph indicating that all paragraphs involve the conduct of the same individuals.

Instruction No. 11 did not observe this requirement. The first and second paragraphs used the word "another", but failure in the second paragraph to link the two coupled with use of "or" in the first paragraph posed a non sequitur, that is, stealing as a disjunctive but threatened use of force as a conjunctive between the co-participants. The confusion is then compounded when the other person is referred to in the third paragraph as "a participant" and in the final paragraph as "such other person."

There was under the evidence presented no suggestion that more than two persons committed the robbery of the Milgram store and there was as well no doubt that both men were armed with deadly weapons with which the store employees were threatened. Assuming the prudence of using MAI–CR2d 2.12 instead of MAI–CR2d 23.02, the instruction to be given should hypothesize the conduct of Scott and another person in committing the theft and the co-participant should thereafter be consistently described in the instruction as "such other person."

**2.** MAI–CR2d 2.12 has been subjected to further change effective January 1, 1983.

### III.

Before trial of Scott's case commenced, he raised by motion in limine the issue of whether his record of prior convictions could be used against him for impeachment should he testify. Of particular concern was a conviction in 1967 for armed robbery. It was Scott's claim that this conviction, being remote and unrelated, should not operate to affect his choice in testifying in his own defense. The motion was overruled and Scott did not testify. He now contends § 491.050, RSMo Supp.1982 is violative of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

■ Assuming, but not deciding, that the constitutional issue has been preserved,[3] Scott was not entitled to testify free of the impediment of his prior criminal record. Section 491.050, RSMo Supp.1982 and its predecessors, of course, constitute the ground upon which convicted felons assert a right to testify. The statute removes the common law bar to such evidence. *State v. Dobbs,* 605 S.W.2d 203 (Mo.App.1980). The statute does not, however, impose any temporal limitation on convictions to be used for impeachment. Scott argues that a limit comparable to Rule 609, Fed.R.Evid. (10 year limitation) is needed to pass constitutional muster.

The argument Scott presents has been considered and rejected in Missouri. In *State v. Williams,* 603 S.W.2d 562 (Mo.1980), the court reaffirmed long standing Missouri precedent on the subject and concluded that any change must come by legislative enactment. We are bound by that holding and affirm the trial court's ruling on the question.

### IV.

In a related point, appellant asserts error in the extent of cross-examination permitted of defense witness Sharon Mayes. The witness had been called to establish that three days before the robbery, she was with Scott and observed him not to have a full beard. The gist of this defense evidence was to suggest that the tall bearded robber described by the Milgram store manager could not have been Scott.

On cross-examination by the state, witness Mayes acknowledged that she had pleaded guilty to a charge of forgery, had received a suspended sentence and was on probation. The prosecutor then inquired as to details of the forgery offense, which involved negotiating a check at a business known as Snyder's Market. Over objection by the defense, the state was then permitted to ask if witness Mayes had not also "passed a check in that same other person's name at the Commence Bank." This was followed by a question as to whether the two instances demonstrated that witness Mayes had lied twice "to get money."

■ The cross-examination by the state was improper and objection by the defense should have been sustained. Once witness Mayes admitted the conviction, the subject was concluded. It is improper to inquire about the details of a crime where a conviction has been shown to impeach the credibility of a witness. *State v. Scott,* 459 S.W.2d 321 (Mo.1970). The details of the offense are irrelevant and are not an appropriate subject for inquiry because permitting that line of questioning gives the prior offense undue emphasis, aggravating its importance in the minds of the jurors. *State v. Williamson,* 584 S.W.2d 628 (Mo. App.1979).

### V.

Additional points raised by Scott are either instances unlikely to occur on another trial or are without merit. Among these, however, is a contention affecting instruction which must be mentioned. In two points, Scott claims the verdict directing instruction was in error for failure to submit the lesser included offense of second degree robbery and for failure to give the associated instruction, MAI–CR2d 2.14. The basis for the points lies in Scott's claim of a distinction between first and second degree robbery in the culpable mental state

**3.** Ordinarily, a motion in limine preserves nothing for review. *State v. Hurst,* 612 S.W.2d 846, 856 (Mo.App.1981).

of the accused. He argues that if the jury did not believe he had the requisite mental state corresponding with the higher grade of the offense, he could have been convicted of the lesser and it was error not to instruct the jury accordingly.

 The fallacy in the contention lies in Scott's assumption that first and second degree robbery are distinguishable by the mental state associated with each crime. In fact, the two robbery offenses differ only in the manner of commission of the robbery, whether by use of a deadly weapon or dangerous instrument or without any weapon. The mental state of the accused is irrelevant. Here, the evidence was uncontroverted that both robbers were armed with guns and used them to threaten the store employees. If the jury believed Scott to have been one of the robbers, the only offense of which he was guilty was first degree robbery. There was no evidence tending to show Scott not guilty of first degree robbery, but guilty of second degree robbery and it was therefore not error not to instruct on the lesser charge. *State v. Neighbors,* 613 S.W.2d 143 (Mo.App.1980).

The conviction and sentence are reversed and the case is remanded for further proceedings consistent with this opinion.

All concur.