**STATE of Missouri, Plaintiff-Respondent,**

v.

**Arlester SCOTT, Defendant-Appellant.**

**No. WD 35598.**

Missouri Court of Appeals, Western District.

Sept. 3, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Oct. 22, 1985.

Application to Transfer Denied Jan. 15, 1986.

Lee M. Nation, Kansas City, for defendant-appellant.

William L. Webster, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Kansas City, for plaintiff-respondent.

Before SHANGLER, P.J., and TURNAGE and BERREY, JJ.

BERREY, Judge.

The defendant was charged with robbery, first degree. He was convicted by the jury and punishment was assessed at twenty-five (25) years.

Judgment affirmed.

This is the second time this case has been before us. *State v. Scott*, 647 S.W.2d 601 (Mo.App.1983). The court reversed that conviction when the trial court admitted the testimony of two witnesses for the state who were not disclosed to the defense in pre-trial discovery.

In the instant case the following evidence was elicited. About noon on March 27, 1981, two negro males entered the Milgram Food Store at 87th and Blue Ridge in Kansas City, Jackson County, Missouri. Manager Donald Gruis testified he had seen the taller of the two men in his store about three to five times before accompanied by a shorter man. Gruis testified, "I got so I recognized him and the other man." The prosecuting attorney asked Gruis if he saw either of the men in the courtroom and Gruis replied, "I think so." He then proceeded to point out the defendant.

Gruis testified when he first saw the defendant on the day of the robbery, the defendant was carrying a brown craft sack. Later, Gruis saw the defendant and the other man by the dairy case with a grocery cart containing groceries. Gruis proceeded to his office to do routine work. When he stepped out of the office he was accosted by the shorter of the two men who was standing there with a gun pointed at him. Gruis was ordered to "come out of there." As Gruis did so, he observed that the taller man, the defendant, had two employees "covered with a gun." Gruis stated he thought the defendant was the taller man. At trial the defendant was clean shaven and during the robbery he had a full beard.

The store employees were herded into the office and forced to their knees with their hands behind their backs. The defendant then opened the craft sack he had been carrying, took out some duct tape and bound the hands of the employees except for Gruis, who they ordered to open the safe. Gruis explained the safe and the alarm system to them and while this discussion ensued a knock came at the door. It was Elmer Eubank, the liquor clerk. The defendant opened the door and pulled Eubank into the room and put the gun in the side of his neck. Eubank was then ordered to kneel and his hands were taped.

The robbers then ordered Gruis to put his key into the safe and open it. He complied. They wanted to know where the cash delivered earlier in the day from Wells Fargo was and Gruis told them it was put away. He then was ordered to open the drawers in the safe. Gruis advised them that the time locks on the drawers required fifteen minutes to activate. The robbers then looked about and found a drawer where the time lock was not set and stole about $600. They also took about $1,000 from another drawer on the back side of the safe and 500 blank Republic money orders.

The shorter man did most of the looking in the safes and did most of the questioning. The defendant stood to the side by the door, and a little behind the employees. Neither robber wore a mask although they both wore surgical gloves.

At this time, the robbers taped up Gruis and fled the store. When Gruis heard the doors rattle he jumped up, broke off the tape, kicked the door open, and gave chase. He observed them enter a green Caprice Chevrolet, 1973 or 1974 model.

Gruis further testified that the taller man wore an "apple hat." When asked what an apple hat was he responded, "I don't know. Its kind of a french hat, flat type hat with a brim on it. *He wore it all the time. Every time he was in the store he had it on.*" (Emphasis added.)

The police department processed the scene, lifted prints and photographed the area.

■ Defendant first alleges trial court error in overruling his motion to dismiss because a reversal by this court constituted double jeopardy.

The first case was reversed because the trial court erred by permitting two unendorsed witnesses to testify about the chain of custody of the duct tape box which was found at the scene and upon which defendant's fingerprint was found. *Scott, supra.*

Certainly, in the instant case, the identification testimony of Gruis is sufficient to let a jury decide the issue and the fingerprint is merely added proof.

The defendant would have us hold that every time a trial judge erred in a ruling double jeopardy would be the end result.[1] This view would place an impossible burden upon a trial judge and, subsequently, society. The United States Supreme Court has recognized this danger and addressed it in several cases.

The court in *United States v. Tateo,* 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964) commented on the theory of double jeopardy and society's rights as follows:

> While different theories have been advanced to support the permissibility of retrial, of greater importance than the conceptual abstractions employed to explain the Ball principle are the implications of that principle for the sound administration of justice. Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest. *Id.,* at 466, 845 S.Ct. at 1589.

The case of *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), distinguishes between double jeopardy being based on insufficient evidence and trial court error.

> In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, *e.g., incorrect receipt or rejection of evidence,* incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished. *Id.,* at 15, 98 S.Ct. at 2149.

Missouri courts have steadfastly held to the theory that double jeopardy applies only when appellate reversal is based on insufficient evidence.

In the first trial, *Scott I,* the trial court erred in admitting the fingerprint evidence. Now, defendant alleges double jeopardy. Such is not the case, however, since the previous reversal was based on trial court error in improperly admitting the challenged evidence. *State v. Onken,* 660 S.W.2d 312, 315 (Mo.App.1982); *State v. Wood,* 596 S.W.2d 394, 398–399 (Mo. banc 1980).

---

**1.** "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." U.S. Const.Amend. V.

The court in *State v. Basham*, 568 S.W.2d 518 (Mo. banc 1978), succinctly sets forth the manner in which double jeopardy comes into play in Missouri by citing *Burks, supra*. "[D]ouble jeopardy provisions of the U.S. Constitution, Fifth Amendment, preclude the retrial of a· defendant where the initial conviction is reversed *solely* for lack of sufficient evidence to sustain the jury's verdict." (Emphasis added.) *Basham, supra*, at 521.

In *Scott I*, the trial court erred in failing to sustain defendant' motion to exclude witnesses for failure of the state to provide timely discovery. Such trial court error is addressed by *Burks* as an incorrect ruling on receipt of evidence and does not give rise to double jeopardy. *Burks, supra*, at 15, 98 S.Ct. at 2149.

Defendant next alleges the trial court erred in permitting the introduction of the duct tape container. Defendant claims there was insufficient evidence to establish that the duct tape box was, in fact, the duct tape box found at the scene.

The defendant, in his brief, claims there is no evidence to establish the box was unaltered from March 30, to April 16, when it was examined by Officer Warlen. Defendant quotes from *Scott I*, "Finally, there was no proof at all that the exhibit was preserved intact from March 30th, the date of the crime,[2] until April 16 when Warlen made his examination." *Scott I, supra*, at 608.[3]

Daniel Burns, a Kansas City, Missouri, policeman, was the first officer to arrive on the scene. He secured the area, and "made sure nobody bothered any of the evidence that was laying around."

William Fortner, a crime scene investigator for the police department, testified he processed the area, photographed the scene to show the location of various items seized for evidence, and collected the exhibits.

Exhibit 6 is a photograph of the scene depicting the duct tape box. Witness Gruis testified that this was the box the robbers left behind.

State's exhibit 15 was a bag which held state's exhibits 16, 17 and 19. Exhibits 16 and 17 were envelopes containing pieces of duct tape. Exhibit 18 was the duct tape box, and exhibit 19 was an envelope containing three rubber gloves. Exhibit 18 was placed in exhibit 17.

Fortner placed the sealed evidence bag, exhibit 15, containing the above exhibits, in the evidence locker at the police station to be forwarded to the Regional Crime Lab.

Marjorie Cation, a civilian employee of the police department assigned to the Regional Crime Lab, testified that exhibit 20 reflects the chain of custody of the evidence. It is the property slip log that accompanies the evidence. It was logged into the lab on March 30, 1981, and released to the property room April 1, 1981. On April 15, 1981, Cation logged it back to the lab and out on April 17, 1981. Cation testified the evidence bag was sealed and she knew of no one who would open it until it was to be analyzed. The defendant relied and based his defense upon the fact that no one could testify second to second, minute to minute, hour to hour, day to day, what happened to the evidence bag after it was in the property room.

Stephen Warlen next testified. He is a police officer assigned to the lab as a latent fingerprint and photographic technician. He identified exhibit 15 as the sack he received the evidence in under report No. P95827, the report number assigned by the police to this investigation.

According to Warlen, the sack was sealed with evidence tape and initialed by Fortner whose initials he was familiar with. After he finished his involvement with the

---

2. The day of the crime was, in fact, March 27, 1981.

3. In the instant case, proof was offered by Marjorie Cation, an employee in the Regional Crime Lab, in support of the state's contention that the exhibit was preserved.

The court in *Scott I* also noted that "the absence of testimony by [William] Fortner left a material gap in the proof necessary to show with reasonable assurance the exhibit was in fact an article collected at the crime scene." *Scott I, supra*, at 608.

evidence it was resealed in the bag, initialed, and returned to the property room. Warlen identified exhibits 16, 17, 18, and 19. Warlen prepared a property slip upon which he listed, "State's Exhibit No. 19 is Item No. 1 that's listed on the property slip.... State's Exhibit No. 17 is the manilla envelope that contains Item No. 2 that's listed on the property slip. State's Exhibit No. 16 is the manilla envelope that contains the property from Item No. 3." Warlen specifically identified exhibit 18, the duct tape card, as part of item 2 (contained in exhibit 17). He put his initials on it, examined it for prints, photographed the prints, and placed it in a plastic bag to protect it.

Warlen testified, "After I processed it, it's possible to leave prints on this same piece of cardboard, so it shouldn't be handled, so it was placed in a plastic bag to protect it."

Warlen proceeded to identify state's exhibit 21 as a photo of exhibit 18. In the process of photographing exhibit 21 he placed a gummed label bearing the file number on a ruler and placed it on the item to be photographed. He then put the label on exhibit 20, the property inventory report, and initialed it. At this juncture Warlen placed exhibit 18 back in the plastic bag, back in the manilla envelope identified as item 2, which is state's exhibit 17, and sealed it. He placed it in state's exhibit 15, the evidence bag, and sealed it.

Even though the cardboard was not specifically listed as being in state's exhibit 17, Warlen testified it came from said exhibit and Fortner testified he had vague recollection of placing it in the exhibit. Warlen testified it was not unusual but happened quite often that items would be in evidence bags that were not listed on the outside of the bag. Warlen acknowledged that perfection dictated a complete inventory on every property bag. It would be utopia to expect perfection from everyone: police, lawyers, judges, and society in general. We can take note, however, that while we often strive for perfection it is seldom achieved.

Officer Schweiterman, a certified latent fingerprint examiner for the Kansas City, Police Department, testified he examined exhibits 18, 21, and 25. Exhibit 21 contained the photograph enlargement of state's exhibit 18 in which a latent fingerprint was clear enough for a comparison.

The defendant and the state stipulated that the right portion of exhibit 25 was a photographic enlargement of state's exhibit 21, the right ring finger of Arlester Scott, taken April 1, 1981. Exhibit 25 also contained the photographic enlargement of the latent print that appeared on exhibit 21.

The officer then testified he had found twenty-four points of comparison between the two prints and both prints belonged to the defendant.

Defendant cites *State v. Meyers*, 172 S.W.2d 946 (Mo.1943) to support his contention. This case, however, deals with chemical analysis and the requirement of demonstrating that the item was the same and that it was in the same condition as when found. *Id.*, at 950. Such is not the case at bar.

■ The general rule is that if the identification of demonstrative evidence is sufficient, then the evidence may be introduced even though the testimony does not directly trace it from hand to hand. *State v. Burney*, 346 Mo. 859, 143 S.W.2d 273, 277 (1940). Defendant also cites *State v. Collins*, 601 S.W.2d 640 (Mo.App.1980), which holds, "The prevailing law in this state is that the evidence must provide 'reasonable assurance' that the exhibit sought to be introduced is the same and in like condition as when received from defendant." *Id.*, at 641. The evidence in Collins is as follows:

After defendant dropped the foil packet into the waiting auto, Officer Dickens opened it and observed a brown, powder-type substance. Officer Dickens placed the packet in a manila envelope bearing his initials and put this envelope into yet another envelope which he likewise, initialed. The entire package was transported to a police lab criminalist who identified the substance as heroin and repackaged it in the same manner as the

officer. The criminalist then stored the two envelopes (which contained the foil package) in a locked evidence locker until the day of trial, at which time he turned the entire package over to the prosecutor. The prosecutor opened the envelopes and foil packet in the presence of the jury and the packet, heroin and envelopes were ultimately admitted into evidence. Given this set of circumstances, there can be little doubt concerning the chain of custody of this particular packet of heroin. *Id.*, at 642.

■ There can be little doubt concerning the chain of custody of the duct tape card. The defendant infers Machiavellian mischief without any substantiating fact. There was no showing of tampering. The seals were intact and the bag had not been torn or otherwise abused. To speculate that the evidence had been tampered with is without foundation and bears no further comment.

■ For Point III the defendant alleges trial court error in not granting his motion for acquittal at the close of the evidence since the evidence was insufficient to support a verdict.

The facts in evidence and all reasonable inferences are considered in a light most favorable to the state and other evidence and inferences are disregarded. *State v. Franco*, 544 S.W.2d 533, 534 (Mo. banc 1977); *State v. Garrett*, 682 S.W.2d 153, 154 (Mo.App.1984).

The appellate court will not weigh the evidence nor determine witness credibility; review is limited to determining if there was sufficient evidence for a jury to find a defendant guilty beyond a reasonable doubt. *State v. McMikle*, 673 S.W.2d 791, 795–796 (Mo.App.1984).

The defendant would have us conclude that this is a circumstantial evidence case. He leads us through a tangled path of convoluted logic in asserting that the defendant's fingerprints could have been inadvertently placed upon the duct tape box when as a shopper he may have handled it and put it back on the hardware store rack.

This is hardly a reasonable hypothesis of innocence.

■ In cases grounded solely upon circumstantial evidence, the facts and circumstances the state relied on must be consistent with each other, consistent with guilt, and inconsistent with any *reasonable* theory of innocence, and they must exclude every reasonable hypothesis of the defendant's innocence. *State v. Prier*, 634 S.W.2d 197, 199 (Mo. banc 1982). However, this case is not bottomed on circumstantial evidence, protestation of defendant notwithstanding. Additionally, the circumstantial evidence rule applies only when all of the evidence is circumstantial and there is no direct evidence. *State v. Holman*, 556 S.W.2d 499, 508 (Mo.App.1977); *State v. Rittenbach*, 637 S.W.2d 820, 823 (Mo. App.1982). In the instant case, witness Gruis offered direct evidence that he thought the defendant was the robber.

■ Missouri cases have repeatedly held that in all instances when the issue of identification is raised the jury decides, and neither trial nor appellate courts may delve into this determination of the weight of the evidence. *State v. Brown*, 542 S.W.2d 789, 791 (Mo.App.1976).

In the instant case, Gruis said the defendant had been in his store with a shorter man on three to five occasions and he recognized him. He viewed the defendant during the robbery which lasted about ten minutes. He testified, "I think" the robber and defendant were one and the same and only because defendant was clean shaven and the robber had a beard was Gruis only "90%" positive in his identification. In *State v. Thompson*, 695 S.W.2d 154 (S.D. Mo.1985), the court affirmed the conviction of the defendant wherein one of the witnesses identified the defendant by saying, "Take off the beard and this looks like him." A more analogous case is hard to imagine.

In *State v. Linzia*, 412 S.W.2d 116 (Mo. 1967), the court ruled that an identification may be admissable if based on the witness-

es personal observation or knowledge. *Id.,* at 120.

To lay a foundation for the receipt into evidence of identification testimony it is sufficient that the witness testify as to his belief regarding the identity of the person provided his belief is based upon personal observation. The competency of the identification testimony is not affected by the witness's failure to testify positively to the identity. *State v. Maxwell,* 502 S.W.2d 382, 391 (Mo.App.1973). It is up to the triers of fact to determine the issues in light of all the evidence and circumstances.

*State v. Blackmore,* 327 Mo. 708, 38 S.W.2d 32 (1931) is perhaps the landmark Missouri case on sufficiency of identification and is recommended reading for those who seek to raise this issue.

The court in *Blackmore* stated:

After careful consideration, we are of the opinion that it was sufficient to make the question one for the jury, and that the learned trial court did not err in refusing to direct a verdict of not guilty. It is true that no witness positively identified either defendant as one of the men seen at the robbery. Caldwell almost did so. As to each defendant, other witnesses said he looked like one of the men, and the witness believed he was one of them. Such testimony, based upon the observation of the witness, and coupled with a description of the person sought to be identified and the circumstances, is competent, and its probative value is for the determination of the jury. *Id.,* 38 S.W.2d at 34.

. . . .

Identification by witnesses of a person they have seen but once before, perhaps in a moment of excitement, is necessarily more or less a matter of opinion. Some witnesses will express that opinion in the form of a positive conviction, perhaps feel convinced, while others more conservative will only express a belief. The triers of the facts, in the light of all the circumstances and evidence, must determine the question. *Id.,* 38 S.W.2d at 35.

Finally, in Point IV defendant alleges the trial court erred in not sustaining his challenges for cause to certain venirepersons. Defendant claims veniremen (9, 14, 17, and 19) Maxwell, McCall, Kirchner, and Schmitz should be disqualified.

To establish qualifications prospective jurors responses must be determined from the entire voir dire and not from an isolated response. *State v. Gilmore,* 681 S.W.2d 934, 944 (Mo. banc 1984). Each of the veniremen, here complained of, stated they could follow the court's instructions and decide each witness's credibility on the basis of what they observed and heard from the witness.

The trial court denied defendant's challenge to the veniremen, and since the trial court is in a better position to consider a challenge for cause than is an appellate court, all doubt should be resolved in favor of the trial court unless its ruling is clearly against the evidence and constitutes a clear abuse of discretion. *State v. Hemphill,* 669 S.W.2d 633, 635 (Mo.App.1984); *State v. Betts,* 646 S.W.2d 94, 98 (Mo. banc 1983).

The questions to the four veniremen and their answers, when read with the entire examination of each venireman, clearly demonstrate the fact that the trial judge acted quite properly under the facts herein. His refusal to sustain defendant's motion to strike the aforementioned veniremen for cause was justified. Defendant's Point IV is denied.

Judgment affirmed.

All concur.