**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Delores M. LUTON,
Defendant–Appellant.**

No. 57066.

Missouri Court of Appeals,
Eastern District,
Division Four.

July 10, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 15, 1990.

Application to Transfer Denied
Oct. 16, 1990.

Raymond A. Bruntrager, Sr., Neil Bruntrager, Mary Bruntrager Schroeder, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., John P. Pollard, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

JOSEPH J. SIMEONE, Senior Judge.

## I.

This is an appeal by defendant-appellant, Delores M. Luton from a judgment of con-

viction entered on July 25, 1989 by the circuit court of Jefferson County, on a change of venue from Cape Girardeau County. Delores M. Luton was charged by an amended information, tried by a jury, found guilty and sentenced by the court to a term of fifteen years in the Department of Corrections and Human Resources for the offense of conspiracy to murder her husband, Wilbur D. "Boots" Luton in violation of § 564.016, a class B felony, punishable pursuant to § 558.011, R.S.Mo.1986. We affirm.

## II.

There are two versions of the events of the alleged conspiracy. The state's version is that Mrs. Luton conspired with Bobby Taylor to have her husband killed and contracted with Taylor to carry out the plan. The appellant's version of the scenerio is that it was, in fact, her husband, "Boots" who desired to have her murdered and Taylor who had informed her of this fact told her that he and a mutual friend, David Mansfield, did not want her killed, so that Mrs. Luton met with Taylor to "lure" Taylor into the Luton home, where she could call the police and disclose the plot on her life.

Obviously, the jury believed the state's version for the jury found Mrs. Luton guilty, and rejected the theory of the defense. Of course, that is the function of the jury.

The principal *dramatis personae* of this scenario involve the appellant, Delores M. Luton, a 59 year old self-made woman who was strong-willed and was a successful businesswoman, owned several businesses, a mini-mall and apartment houses. She had been married to her husband Wilbur D. "Boots" Luton since 1969, and had several children by a previous marriage. Mr. Luton, while not a "wild man," was inclined towards violence to his wife, drank heavily, collected an assortment of guns, and suffered from a rare, probably fatal disease of cranial neurosis. Another principal in the course of events was Bobby Taylor, an undercover agent for Tennessee authorities, and one of the principal witnesses for the state against appellant. A conversation occurred between Mrs. Luton and Taylor. Taylor had a small micro-cassette tape recorder in his pocket and taped the damaging conversation during which Mrs. Luton told him she wanted to have her husband killed, and that she would reward Taylor handsomely for the murder, and gave directions on how the murder should be carried out. Another important person in these events was Jack Swinford, a friend and tenant of Mrs. Luton. He was a principal defense witness. On his cross-examination he discussed a statement that he earlier had given to the police, after Mrs. Luton's arrest. In that statement, he revealed that Mrs. Luton offered him money and other goods to lie for her on the witness stand. This written statement was not given to the defense until after Swinford had testified at trial; it was not turned over to the defense in the course of pre-trial criminal discovery. This failure on the part of the state to disclose Swinford's damaging statement is one of the principal points on this appeal. Another person involved in the events was David Mansfield, a former boyfriend of Mrs. Luton, who was a musician and played at one of Mrs. Luton's businesses. He had been involved in a criminal activity and was convicted for murdering a man.

## III.

The facts are very numerous, complex, detailed, and often contradictory. Two points are raised by appellant. First, she contends the trial court erred in denying appellant's motion for mistrial after the testimony of Jack Swinford because the state failed to comply with the Rules of Criminal Discovery and failed or refused to disclose, prior to trial, the damaging statement of Jack Swinford that Mrs. Luton offered him monetary emoluments to lie for her on the witness stand. Second, the trial court erred and abused its discretion in (a) admitting into evidence the damaging micro-cassette audio tape of the conversation between Bobby Taylor and Mrs. Luton when the details of the conspiracy were discussed because it either was inaudible, or contained numerous inaudible gaps so

that it was not credible, and (b) permitting the state to utilize a "transcript" of the tape in the state's opening statement and in the cross-examination of Mrs. Luton. Based upon these alleged errors, appellant contends her trial was "fundamentally unfair" and that the cause should be reversed, or at least reversed and remanded for a new trial. We reject both contentions of the appellant and conclude the trial court did not err or abuse its discretion and consequently affirm the judgment of conviction.

### IV.

On June 2, 1988, Mrs. Luton was charged by an amended information in the County of Cape Girardeau with "conspiracy to commit murder" acting either alone or in concert with another. The information charged that on or about April 10, 1988, she "agreed with Bobby Taylor that one or more of them would kill Wilbur Luton," and in furtherance of that conspiracy she paid Taylor $2,600 as a "down payment" for the killing, showed him where the murder was to take place, made arrangements to provide him with the murder weapon, and "made arrangements with him to receive the rest of the money after the murder." Several witnesses were endorsed on the information, including certain police officers, Bobby Taylor of Portageville, Missouri and others. Jack Swinford was not endorsed as a state's witness.

Prior to trial, appellant filed a "motion to produce" requesting that the state disclose certain materials and information "within its possession and control" pursuant to Rules "25.03" [not 25.04] and "25.08." The defense requested the state to produce *inter alia* (a) the names and addresses of the persons the state intends to call as witnesses, "especially the transcription of any taped conversations between Bobby Taylor and Delores Luton," (b) any recorded or written statements made by appellant, (c) any material or information within the possession of the state that tends to negate the guilt of the defendant, (d) any tapes made during the course of the state's investigation, and in paragraph 24(e) requested "copies of all statements in the possession

of the State of Missouri or the office of the Cape Girardeau County Prosecutor's office or in the possession of any law enforcement officer involved in the investigation of the incident which gave rise to the charges filed against Defendant which *would tend to impeach the credibility of any witness upon which the State of Missouri and Prosecuting Attorney intend to rely upon [in] this trial including, but not limited to statements which contradict other statements by these and other persons."* (Emphasis added).

The state responded to the defense's motion to produce. The state endorsed a number of witnesses, including Bobby Taylor, stated that the statements made by Delores Luton to Bobby Taylor have been disclosed, declared that it did not intend to use any expert witnesses, and stated that it planned to "introduce ... (1) the micro-cassette tape of the conversation between Bobby Taylor and Delores Luton, (2) the cash paid by Delores, (3) the "crowbar" and gloves found in the possession of defendant, (4) photographs taken during surveillance of the meeting between defendant and Bobby Taylor, and (5) a transcript of the taped conversation, as well as other items."

On July 27, 1988, a hearing was held on the motion to produce and on a motion for change of venue. During the hearing the court said that the defense was entitled to "everything that is discoverable." At the hearing on the motions, the court denied certain of the requests and granted others. As to paragraph 24, the prosecution objected. As to that paragraph, the following discussion took place:

> [*Prosecutor*]: Your Honor, I would object to the form of 24.
>
> *The Court:* He is just asking for all statements.
>
> [*Prosecutor*]: Well, no, but he goes on that tend to impeach the credibility of any witness. We have provided him with all statements.
>
> *The Court:* That takes care of it then; if he's got all statements, he's got all statements.

[*Prosecutor*]: It seems to me that it [sic] is asking me to draw a conclusion saying, well these are all the ones to impeach—
*The Court:* I am not going to require you to draw a conclusion. [The defense attorney] is certainly capable of that ...
[*Defense Counsel*]: I would hope so.

On January 29, 1989, a hearing was held on several pre-trial motions to suppress filed by the defense—to exclude confessions and statements or admissions against interest. The prosecutor informed the court that he had given the defense additional statements from "two people" who had been endorsed as witnesses—Brenda Berry and Judy Jusits.

A hearing was held on the motions to suppress the tape recording made by Bobby Taylor with appellant on April 10, 1988. During the suppression hearing, Taylor was shown exhibit 1–A, a transcript of the April 10, 1988 taped conversation, and Taylor testified it "is as accurate, ... to my knowledge, you know," although there were various parts of the tape that one could not hear which was shown by "dots."

The tape was played at the suppression hearing, and Officer Donnie Smith testified that there was no difference from the way it was played on April 10, 1988 and as played at the hearing. He further testified that no alterations had been made. As to the transcript of the tape, he delivered a copy to the prosecutor's office.

At the conclusion of the suppression hearing, defense counsel objected to the admission of the tape and the transcript on the ground it was not "legible" enough to rise to the level of being credible and admissible evidence, and in violation of defendant's constitutional rights. The court overruled the motion to suppress the tape, and the "crowbar," gloves and money, found in the possession of appellant when arrested, but reserved ruling on the contents of defendant's purse.

## V.

The trial began on May 11, 1989. Before trial began, defense counsel requested a continuance because of the absence of a former F.B.I. agent in Cape Girardeau who would testify that the police in Cape had a "vendetta" against appellant, and often tried to entrap her into prostitution. However, the motion for continuance was overruled. Defense counsel also moved to suppress the tape recording between Taylor and Luton. This motion, too, was overruled. Defense counsel also moved for a continance because the defense's "material witness," Jack Swinford, who was under subpoena, was involved in an accident and had undergone surgery—"he is very essential, material and he corroborates her story with respect to a phone call and meeting with the informant [Taylor] in this case." The court overruled the motion for continuance.

Taking the evidence most favorable to the verdict, the jury could reasonably find the following.

On April 4, 1988, Bobby Taylor, who lived in Portageville, Missouri, and who had done some "undercover" work for Tennessee police authorities, received a phone call from Mrs. Luton at his home and told him she wanted to talk to him about something "urgent." He suggested she call him the next day at his "body" shop. When he received the call, he had a "feeling" that something was going to happen in Tennessee because of previous relationships with certain parties, so he notified Chief Charles Bane of Dyersburg, Tennessee. The two met in Caruthersville, and Taylor told him about the call he had received from Mrs. Luton. The next morning Mrs. Luton again called Taylor and the two met at his home. She told him that she wanted to have her husband murdered and that she would pay him $5,000 and $15,000 out of a $2 million dollar insurance policy that existed on the life of "Boots" Luton. They then agreed to meet in a parking lot at a restaurant called Papa D's, in Cape Girardeau at 10:00 a.m. to talk about the details. The murder was to take place Sunday afternoon, April 10, at the Luton home. After the meeting with Mrs. Luton, Taylor again called Chief Bane and told him that he was wrong about a murder taking place in Tennessee; that it was going to take place in Missouri. Bane suggested that the Mis-

souri authorities be brought into the case and contacted Sergeant Herbert A. Campbell of the Missouri State Highway Patrol. Sergeant Campbell and other officers, including Bane met with Taylor at a weigh station on I–55. Taylor related to them the story concerning Mrs. Luton's call. He told the officers that he and Mrs. Luton were to meet at Papa D's restaurant parking lot off I–55 and that Mrs. Luton said she would show Taylor "how to do it." Sgt. Campbell planned to relate the information to other officers and have the Luton–Taylor meeting put under surveillance. They all agreed that Taylor should keep the meeting with Mrs. Luton on April 10, at Papa D's, and that Taylor should wear a tape recorder. Sergeant Campbell assigned Officer Donnie Wayne Smith to be in charge of the investigation. The next day, April 8, 1988, Smith and Campbell met at Taylor's home. In his testimony, Sergeant Campbell stated he had no vendetta against Mrs. Luton. He also stated that he had known Taylor for some years and that Taylor had been involved in criminal activity in the past, and was associated with David Mansfield, who had previously bombed a car and was convicted of the murder of one, Danny Recker, and was now in prison for life without parole.

Patrolman Smith agreed that Taylor should keep the meeting with Mrs. Luton at Papa D's on Sunday, April 10, 1988 and that they would meet earlier that morning in order to give Taylor a micro-cassette tape recorder to record the conversation between Taylor and Mrs. Luton. Smith contacted other police officers, including Sheriff Copeland of Cape Girardeau to plan a surveillance of the April 10, meeting by using a hi-tech van which included a periscope, a video camera and other hi-tech equipment. Sergeant Kenneth Hoelker, an investigator with the Missouri Highway Patrol was in charge of the surveillance and brought the van from Jefferson City to Cape Girardeau to watch the Taylor–Luton meeting.

On Sunday morning, April 10, Officer Smith and Taylor met at 9:00 a.m. and Smith gave Taylor a small tape recorder which was placed in a small cigar box and then placed in his shirt pocket—to record the conversation.

On April 10, with the surveillance team watching and videotaping, Mrs. Luton drove onto the parking lot at Papa D's at about 9:50 a.m. in her 1982 gold Cadillac which previously had belonged to her mother-in-law, and which had a Tennessee license plate. At 9:58 a.m., Bobby Taylor drove onto the lot in his truck. They talked a few minutes and got into Taylor's truck where the taped conversation took place, and drove away. They returned at 10:26 a.m. During the drive in the truck, a surveillance team watched them drive to the Luton home, and an officer saw Mrs. Luton pointing.

The taped conversation lasted about one-half hour. During the hearing on the motion to suppress and again at trial after the testimony of Officer Smith, the tape was offered and admitted in evidence and played to the jury. Prior to the jury hearing the tape, defense counsel objected to the tape because it was immaterial, prejudicial, no chain of evidence was shown and because the tape had been altered. All the objections were overruled. The court said that it had listened to the tape at the motion to suppress hearing and that "it is sufficiently audible to play to the jury." A mistrial was sought and overruled. While there are some parts of the tape which are inaudible, the bulk of the tape is clear and audible and contains many damaging statements about how Mrs. Luton has lived with her husband for a long time, how she wanted him killed so that she would not have to divide her hard-earned money and property "50–50" under the new divorce law, and how she would leave the house and how Taylor should wait for "Boots" to come home and "kill him like a tiger." She told Taylor that "Boots" would return to their home about 2:00 p.m. and the door would be open so Taylor could get in. She showed him the house where they lived. Taylor said, "Do you want to make it look like he's beat to death?" And Mrs. Luton answered "Whatever is the easiest, the fastest and the quickest, no problem ... Man, just take him like he's a tiger." She

told him she would leave a "crowbar" or "flat bar" "and a pair of gloves." When asked by Taylor whether she could handle pressure, she replied that "Can I handle pressure? You live with.... for as long as I have, you could stand all kinds of it." Mrs. Luton gave Taylor $2,600 in $100 bills.

When Taylor returned to the parking lot, Taylor turned the tape and money over to Patrolman Smith. Smith, other police officers and Taylor then went to the Victorian Motel to listen to the tape, and all the officers testified that the contents of the tape were the same when they first listened to it and when played at trial. The tape was then turned over to Jefferson City. The tape was transcribed, but the transcript, which was not admitted into evidence, contained many gaps. The transcript was apparently used by the prosecuting attorney during his opening statement and some of it when cross-examining Mrs. Luton. The defense complains of these uses of the transcript.

All the police officers who testified, stated that while Mrs. Luton had an "abrasive" character and made many complaints to the police concerning their failure to investigate certain matters, including a time when her husband was assaulted, sewer taxes and real estate taxes, no one in the department had any vendetta against her.

After the taped conversation with Taylor, a warrant was obtained for the arrest of Mrs. Luton, and Officer Eugene Majoros stopped her car during the afternoon of April 10 and arrested her for conspiracy. In the car he searched her purse and found a "metal object sticking out of the gold purse." He also found a pair of canvas gloves. He was one of the officers who heard the tape recording in the motel room.

In the defense's case in chief, one of the important witnesses for the defense, who was not endorsed as a state's witness, was Jack Swinford. He had been previously convicted. He rented an apartment from Mrs. Luton and had known her for four or five years. When she operated the Riverboat Lounge, he was a musician there. He was acquainted with David Mansfield, who

also worked at the Lounge and knew Mr. Luton. Swinford described Luton as a man who "did not get really wild" and "I never did see him drunk." On Monday, April 4, 1988, he testified that he was present when Mrs. Luton received a phone call at the mall and "she was crying ... like somebody said something bad to her on the phone."

On cross-examination, the first question the prosecutor asked was: "Jack, isn't it true that Delores Luton offered you Five Thousand Dollars, a [two carat] diamond ring, and a set of drums to lie on the witness stand today?" His answer was "Yes, sir." He related that Mrs. Luton wanted him to say that "I overheard and listened while the guy made the conversation with her that her husband wanted to kill her, and he needed to talk to her because he was friends with David Mansfield and he didn't want David mad, so he thought Delores better talk to him before he did anything about it ..." Mrs. Luton also asked Swinford to testify that he went to Sikeston with her and waited for her at the Holiday Inn while she went down and talked to Bobby Taylor to set up the April 10 meeting "and if she wasn't back in two hours, I was supposed to send the State Patrol after her 'cause she was in some kind of trouble." None of that, however, was true. Swinford's statement was given to the authorities after Mrs. Luton was arrested. She wrote all of what Swinford was to say on a legal pad, and asked him to rehearse it. No objection was made to this testimony.

On questioning by defense counsel, Swinford said he told this story to the prosecutor a "couple of weeks ago." At that point, trial ended for the day.

The next day, defense counsel moved for a mistrial on the ground that the written statement given by Swinford, dated April 26, 1989, was given to defense counsel the day before, May 12, 1989, after trial had concluded for the day. The defense argued that the prosecutor had a duty to disclose that statement to it. Counsel argued that under Rule "25.03," the prosecutor had a duty to disclose the statement under the

amended motion to produce, and relied upon *State v. Clark*, 592 S.W.2d 709 (Mo. banc 1980). Counsel argued for sanctions pursuant to Rule 25.16, and requested a mistrial.

The prosecutor countered citing *State v. Willis*, 706 S.W.2d 265 (Mo.App.1986) which held that defense witnesses' statements taken by the prosecution do not need to be disclosed under the Rules. After the colloquy, the court overruled the motion for mistrial.

Delores M. Luton testified in her own behalf. She testified she was acquainted with Jack Swinford and had known him for some six years. She also testified that she knew of occasions when her husband had "paid witnesses to testify falsely."

She testified that on April 4, 1988, she received a call from Bobby Taylor while Jack Swinford was present and Taylor told her that her husband "has a contract to have you killed." Delores had met Bobby Taylor when he had a "body" shop, and when David Mansfield was playing in the band, and Mansfield took her car to Taylor's to get repaired. Later she often met with Taylor. One day in February, 1987, she heard David Mansfield and Bobby talking about an old man who had a lot of money in a cigar box. They wanted to buy some marijuana and needed some $10,000 and were going to rob the man, and might kill him. She talked to Mansfield about it, and they got into an argument, and she said "I'm finished." He put a knife to her throat, causing blood to let. He told her that he knew she had money in the mall and took $3,000. This was in February, 1987. She became acquainted with Mansfield when Mansfield applied for a job as a drummer upon the recommendation of a well-known local musician. Mansfield was hired. She did not know Mansfield had a criminal record. He was hired in October, 1986.

At one point there had been a fight between Mr. Luton and Mansfield. One night "Boots" "beat her up." She wound up with a fractured knee. She ran to Mansfield's house who wanted to take her to the hospital, but she refused. When she went home with Mansfield, "Boots" and Mansfield got into a fight. Mansfield hit "Boots." Mrs. Luton tried to break up the fight.

She further testified that she married Luton in 1969 and by that time had acquired many properties. She often talked about a divorce from Luton. She made a will in 1976, and inserted a clause about what should be done if she were killed by Mr. Luton. She did this because he was a violent man. She admitted that she was often abrasive with the police and made many complaints.

She denied she offered Swinford any money, a ring or drums.

She testified on April 4, she received a call from Bobby Taylor telling her that "Boots Luton had a contract on your life." She then called Taylor and said that she needed to talk to him. Taylor told her to call him tomorrow. That was at noon on Monday, April 4. She called him the next day, Tuesday, April 5, and he told her that "Boots was going to have her killed; I don't think we ought to talk on the phone. I need to meet with you." She suggested he come to Cape Girardeau. But they met at a station on I–55. They went to his house. He told her that "Boots" offered him money to kill her, and that he discussed the matter with David Mansfield and "I don't want anything to happen to you and certainly David doesn't." Taylor suggested that "Why don't we just turn this around on him." Taylor bragged about his "insurance murders" and how he gets 20% of the insurance policies. She said that Taylor was the first to bring up the question of insurance. "Boots" had offered Taylor $5,000 to kill her. So she decided to get Taylor to come to Cape and get in her house and "have him arrested." She said that is why they agreed to meet at Papa D's. She never intended to have her husband killed. However, she never reported any of this to the police.

So that is why she met Taylor on Sunday, April 10, 1988. Her intentions were to get him in her house and call the police. As to the "crowbar" and gloves, she explained that by saying that she works with

a lot of wrought iron for the birds she kept and "you get so dirty." She testified she had no intention of causing any harm to Taylor or her husband.

As to the insurance policies, she changed beneficiaries on the policies because she wanted her children to have the money, not her husband. She concluded her testimony by saying she had no intention of causing any harm to her husband:

"I protected that man and kept him from bad publicity,—down, drunk, I have drug him in. I have done everything in my power to keep from having disgrace brought on us because of him."

She also said she had a tape recorder at the April 10 meeting but did not turn it on.

After all this evidence was introduced, the court gave instructions, arguments were made and the jury retired to deliberate. It deliberated two hours and unanimously found Mrs. Luton guilty of conspiracy to commit murder.

On July 21, 1989, appellant's motion for new trial and for judgment were overruled, allocution was granted and judgment was entered sentencing Mrs. Luton to 15 years in prison.

In due time, appellant appealed to this court.

### VI.

On appeal, appellant contends that the trial court erred in (1) denying her motion for new trial because the prosecution failed or refused to disclose prior to trial the damaging statement of Jack Swinford in violation of Rule "25.04" [not 25.03] so that the trial resulted in fundamental unfairness, and (2) abusing its discretion in admitting the April 10, 1988 taped conversation between Taylor and Mrs. Luton because it was inaudible and contained numerous gaps and in permitting the transcript to be used by the state in its opening statement and to impeach Mrs. Luton.

Appellant argues that she filed her request for discovery pursuant to Rule 25.03 and requested that the state disclose copies of "all statements which would tend to impeach the credibility of any witness ..."

Appellant argues that the object of Rule 25 is to permit defendant a decent opportunity to prepare in advance of trial and avoid surprise, *State v. Scott*, 647 S.W.2d 601 (Mo.App.1983), and contends that the failure of the state to disclose Swinford's statement resulted in "fundamental unfairness." The defense relies upon *State v. Kehner*, 776 S.W.2d 396 (Mo.App.1989) and contends it is directly in point. Appellant alleges that the trial court erred in not declaring a mistrial, and that the granting of a mistrial is a proper sanction under Rule 25.16.

### VII.

The Missouri Rules require reciprocal pre-trial discovery in criminal cases. The Supreme Court has adopted rules for such purposes. The new Rules represent the apogee of pre-trial discovery in criminal cases and may well be the most liberal of any state in the nation. Certainly, the Rules are much more liberal than in the federal system.

Criminal discovery has had a long history. The historical English practice, as exemplified in *Rex v. Holland*, 100 Eng.Rep. 1248 (1792) held that:

The practice on common law indictments, and on informations on particular statutes, shews it to be clear that the defendant is not entitled to inspect the evidence, on which the prosecution is founded.

*See People ex rel. Lemon v. Supreme Court*, 245 N.Y. 24, 156 N.E. 84 (1927) for English and American history of pre-trial discovery.

Two legal giants, Learned Hand and Chief Justice Vanderbilt were against pretrial discovery in criminal cases for many reasons. *See United States v. Garsson*, 291 F. 646, 649 (D.C.N.Y.1923) and *State v. Tune*, 13 N.J. 203, 98 A.2d 881 (1953); *see also*, Comment, Criminal Discovery, 10 St. Louis U.L.J. 518 (1966). *Cf.* Brennan, *The Criminal Prosecution: Sporting Event or Quest for Truth*, 1963 Wash.U.L.Q. (1979).

But the momentum for liberal criminal discovery came to Missouri in 1972 with the Rules and as the Rules were later amend-

ed. *See* Simeone, *The New Rules of Criminal Discovery in Missouri*, 31 J. of Mo.Bar 16 (1975). Rules 25.03, 25.04, and 25.06 are the pertinent Rules in this proceeding. Rule 25.03 provides that the state shall, upon written request, disclose (1) the names and addresses of persons whom the state intends to call as witnesses, together with their statements, (2) written statements and the substance of oral statements, and many other reports or statements listed in the Rule. Rule 25.04 supplements Rule 25.03. That Rule provides that the defense may make a written motion to disclose material not covered by Rule 25.03, and if the court finds the request reasonable, it shall order disclosure. Rule 25.16 provides for sanctions for failure to comply with discovery.

■ The basic object of the criminal discovery process is to permit the defendant a decent opportunity to prepare in advance of trial and to avoid surprise. *State v. Kilgore*, 771 S.W.2d 57, 66 (Mo. banc 1989); *State v. Sykes*, 628 S.W.2d 653, 656 (Mo. 1982); *State v. Johnson*, 524 S.W.2d 97, 101 (Mo. banc 1975). The Rules of criminal discovery are not "mere etiquette" nor is compliance discretionary. *State v. Scott*, 647 S.W.2d 601, 606 (Mo.App.1983); *State v. Kehner*, 776 S.W.2d 396, 397 (Mo.App. 1989). *See also*, the basic reasons and needs for pre-trial criminal discovery in the ABA Standards For Criminal Justice Relating to Discovery and Procedure Before Trial, § 1.1 (1970).

■ In admitting evidence not disclosed, fundamental unfairness is measured by whether the evidence or discovery would have affected the result. *State v. Royal*, 610 S.W.2d 946, 951 (Mo. banc 1981).

In *State v. Kehner, supra*, this court, in relying upon the above general principles, remanded a cause because the state failed to disclose a *state's* rebuttal witness. That is not the situation here.

■ While the Rules of criminal discovery in Missouri are liberal and provide wide latitude to obtain many facts, statements, and reports prior to trial, the Rules are not absolute and do not allow or provide for every facet of what may take place in a criminal trial. In *State v. Willis*, 706 S.W.2d 265, 268 (Mo.App.1986), relied upon by the trial court in denying the defense motion for a mistrial because of Swinford's statement, the defendant claimed that his rights to discovery were violated because the state did not furnish defense counsel with copies of statements the state had obtained from the defendant's alibi witnesses. The Western District held that these statements are not within the provisions of Rule 25.03. "Defense witnesses' statements are not a part of the material which the rule requires be disclosed." 706 S.W.2d at 268.

■ It is to be noted that in paragraph 24 of the appellant's amended motion to produce, defense counsel requested that the state disclose and produce copies of all "statements in the possession of the State of Missouri ... which would tend to impeach the credibility of any witness *upon which the State of Missouri and Prosecuting Attorney intend to rely upon [in] this trial*, including but not limited to statements which contradict other statements by these and other persons." (Emphasis added). The Jack Swinford statement did not come within the purview of paragraph No. 24, nor is the Swinford statement within the provisions of the Rules of Criminal Discovery. Hence the trial court did not commit any error in refusing to declare a mistrial after the Swinford statement was disclosed on cross-examination.

It has often been stated that the granting of a mistrial is a drastic remedy to be employed only in extraordinary circumstances in which prejudice to the defendant can be removed in no other way. *State v. Reynolds*, 782 S.W.2d 793 (Mo.App.1989) *State v. Clark*, 756 S.W.2d 565, 570–571 (Mo.App.1988); *State v. Young*, 701 S.W.2d 429, 434 (Mo. banc 1985), *cert. den.*, 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1984).

■ The issue presented in this proceeding is not a *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), type of situation. The scope of the state's duty to disclose under our discovery

rules overlaps, yet differs from, the scope of the state's duty to disclose under the doctrine established in *Brady* and its progeny. *See State v. Grant,* 784 S.W.2d 831, 835 (Mo.App.1990); *State v. Charity,* 637 S.W.2d 319, 322–23 (Mo.App.1982); and *State v. Brooks,* 551 S.W.2d 634, 655 (Mo. App.1977). *Brady* deals with the failure of a prosecutor to disclose evidence favorable to a defendant, and not taped statements. *State v. Grant,* supra.

The first point raised by the appellant must, therefore, be denied.

### VIII.

Appellant's second point relied on concerns the trial court's admission of the tape recording of the April 10 conversation between appellant and Bobby Taylor and the state's use of a transcript of that recording at trial. Appellant specifically claims that "the trial court abused its discretion in admitting the audio tape and allowing the transcript of the tape to be utilized by the state to impeach witnesses for the reason that the tape was inaudible and contained inaudible gaps and the transcript was inaccurate and speculative." We address the tape and the transcript separately.

After the April 10 conversation between appellant and Taylor, Taylor immediately turned the tape over to the police who then listened to the tape. Technicians employed by the State Highway Patrol prepared a transcript of the tape which admittedly contained some gaps. The state apparently used this transcript to some extent in its opening statement although the transcript itself was not admitted into evidence. The tape was admitted into evidence and played for the jury at trial.

■ It is well settled that a partially inaudible tape recording is admissible if the inaudible portions do not render the entire tape untrustworthy; this question is left to the discretion of the trial judge. *State v. Clark,* 693 S.W.2d 137, 140 (Mo.App.1985); *State v. Torregrossa,* 680 S.W.2d 220, 230 (Mo.App.1984). The trial court's decision in such matters will not be disturbed absent a clear abuse of discretion. *State v. Wahby,* 775 S.W.2d 147, 153 (Mo. banc 1989).

■ In the case at bar, the trial judge found that the tape was audible and permitted the jury to hear it. This court has also reviewed the tape and agrees with the trial court. A great portion of the tape was understandable and those portions that were unclear did not render the whole untrustworthy. We find no abuse of discretion in allowing the tape to be admitted into evidence.

The argument portion of appellant's brief also raises the claim that the tape should not have been admitted because one of the audible portions made reference to other criminal activity. Specifically, appellant stated that Mrs. Luton had stolen liquor and cigarettes in her possession and that she would have to hide them because the police were liable to conduct a search subsequent to "Boots"' murder. The trial court found that these references were permissible because they showed appellant's intent. *State v. Rose,* 727 S.W.2d 919, 921 (Mo.App.1987).

■ Because appellant did not raise this allegation in her point relied on, it is technically not preserved for appeal. Rule 30.06(e); *State v. Stevenson,* 589 S.W.2d 44, 47 (Mo.App.1979); *State v. Morrow,* 541 S.W.2d 738, 740 (Mo.App.1976). However, we review this claim for plain error. *State v. Moone,* 714 S.W.2d 216, 218 (Mo.App. 1986). We find no plain error here. The references to stolen goods were made in the context of appellant explaining her plan to Taylor and demonstrate that she had thought out the consequences of the murder. The statements were admissible to show appellant's intent.

■ Regarding the transcript, we first note that the point relied on complains the transcript is inaccurate and speculative. As appellant has not provided us with a copy of the transcript on appeal, we cannot ascertain the truth of this matter. In the argument, appellant complains that the court allowed the state "unfettered" use of the transcript at trial. She claims the prosecutor in fact used the transcript during his opening statement and to impeach appellant, but does not provide any page ref-

erences. *See* Rule 30.06(h). *Walker v. State*, 607 S.W.2d 181, 183 (Mo.App.1980).

However, we have reviewed the record, and find no improper use of the transcript. The transcript was not admitted into evidence. During cross-examination of appellant, the prosecutor apparently used portions of the transcript only to the extent that he would read a statement from the transcript, play the tape, then ask appellant if she heard that statement on the tape. In almost every instance, the appellant answered affirmatively. During opening statement the prosecutor summarized the April 10 conversation between appellant and Taylor, and apparently read portions of the transcript. The manner in which the transcript was used here, however, was under the control of the trial judge and we find no abuse of discretion. The court did not admit the transcript into evidence, but did admit the tape.

The cases appellant relies on to support this point are not germane. *State v. Engleman*, 653 S.W.2d 198 (Mo.1983), involved a situation where a written transcript was shown to the jury in its entirety. *United States v. McMillian*, 508 F.2d 101 (8th Cir.1974), contains an extensive discussion of the proper use of transcripts, but does not prohibit their use in this case. The majority in *McMillian* concerns presentation of the written transcript to the jury, but it also states that "[t]ranscripts should not ordinarily be read to the jury or given independent weight." *Id.* at 105–106. In the case at bar, the transcript was not actually read to the jury or given independent weight in a manner which would offend *McMillian*. These cases fail to satisfactorily resolve the appellant's point on this issue.

## IX.

We have carefully read the entire record in this complex case. We have read the briefs of the parties and all the authorities relied upon. While there were many discrepancies in the facts, and while counsel for the defense rendered an efficient and outstanding defense for appellant, the jury was not persuaded by Mrs. Luton's theory of the case, but believed the state's evidence to be more credible. We find no prejudicial error. The appellant is entitled to a fair trial, not a perfect one. She received it. Therefore, the judgment of conviction is affirmed.

Judgment affirmed.

CARL R. GAERTNER, P.J., and STEPHAN, J., concur.